**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNTEJUANETTE COSBY,

    *Plaintiff*,

v.                                    CASE NO. 10-CV-12375

COMMISSIONER OF            DISTRICT JUDGE JOHN CORBETT O'MEARA
SOCIAL SECURITY,             MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

**I.    RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff's minor child, M.C., is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

**II.    REPORT**

    **A.    Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability and supplemental

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

security income (SSI) benefits for Plaintiff's minor child. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 18.)

Plaintiff's daughter, M.C.,[2] was 10 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 11 at 14, 16.) Plaintiff filed the instant claim on July 11, 2006, alleging that M.C.'s disability began on March 22, 2005. (Tr. at 106.) The claim was denied at the initial administrative stages. (Tr. at 70.) In denying the claims, the Defendant Commissioner considered Attention Deficit Hyperactivity Disorder ("ADHD") as a possible basis of disability. (*Id.*) On February 24, 2008, Plaintiff appeared before Administrative Law Judge ("ALJ") Patricia McKay, who considered the application for benefits *de novo*. (Tr. at 10-24.) In a decision dated May 12, 2009, the ALJ found that M.C. was not disabled. (Tr. at 24.) Plaintiff requested a review of this decision on May 28, 2009. (Tr. at 8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on November 27, 2009, when, after the review of additional exhibits[3] (Tr. at 304-34), the Appeals Council denied Plaintiff's request for review. (Tr. at 3-5.) On June 16, 2010, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.    Standard of Review**

---

[2]Rule 5.2(a)(3) of the Federal Rules of Civil Procedure prohibits the use of a minor's name and requires that only a minor's initials be used.

[3]In this circuit, when the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531

("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, the court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of the court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record,

4

regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C.  Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program (DIB) of Title II, 42 U.S.C. § 401 *et seq.*, and the Supplemental Security Income Program (SSI) of Title XVI, 42 U.S.C. § 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

A child will be considered disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations . . . ." 42 U.S.C. §

5

1382c(a)(3)(C)(i). To determine whether a child's impairment results in marked and severe limitations, SSA regulations[4] prescribe a three step sequential evaluation process:

1. If a child is doing substantial gainful activity, the child is not disabled and the claim will not be reviewed further.

2. If a child is not doing substantial gainful activity, the child's physical or mental impairments will be considered to see if an impairment or combination of impairments is severe. If the child's impairments are not severe, the child is not disabled and the claim will not be reviewed further.

3. If the child's impairments are severe, the child's impairment(s) will be reviewed to determine if they meet, medically equal or functionally equal the listings. If the child has such an impairment and it meets the duration requirement, the child will be considered disabled. If the child does not have such impairment(s), or if the duration requirement is not met, the child is not disabled.

20 C.F.R. § 416.924(a). In the third step – namely, whether a child's impairment(s) functionally equals the listings – the Commissioner assesses the functional limitations caused by the child's impairment(s). 20 C.F.R. § 416.926a(a). The Social Security regulations list specific impairments relevant to step three, some of which apply only to children. *Id.* § 416.924(d). A claimant bears the burden of proving that his or her impairment satisfies, or "meets," one of the listed impairments. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir.1995); *see also Hall ex rel. Lee v. Apfel*, 122 F. Supp. 2d 959, 964 (N.D. Ill. 2000) (child's claim). Once a claimant makes such a showing, an irrebuttable presumption of disability arises and benefits must be awarded. *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).

To "meet" a listed impairment, a child must demonstrate both "A" and "B" criteria. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "A" criteria are medical findings and "B" criteria "describe impairment-related functional limitations." *Id*. An impairment that shows some but not all of the

---

[4] For a history of these regulations, see *Molina v. Barnhart,* No. 00-CIV-9522(DC), 2002 WL 377529 (S.D.N.Y. March 11, 2002).

criteria, no matter how severely, does not qualify. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir.1995); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). If a child's impairments do not "meet" a listed impairment, they may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. 20 C.F.R. § 416.926a(a). A child's impairments "equal" a listed impairment when the child demonstrates a "'marked' limitation[ ] in two domains of functioning or an 'extreme' limitation in one domain." *Id.*

Domain analysis is equivalent to analysis of the "A" and "B" criteria for listed impairments, and focuses on "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The regulations include six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *Id*. A "marked" limitation is one which "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). It "is 'more than moderate' but 'less than extreme.'" *Id.*

### D. ALJ Findings

The ALJ applied the Commissioner's disability analysis described above and found at step one that M.C. was a school-age child when the application was filed and that she had not engaged in substantial gainful activity at any time relevant to this decision. (Tr. at 16.) At step two, the ALJ found that M.C.'s attention deficit hyperactivity disorder and oppositional disorder were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that M.C.'s combination of impairments met or equaled one of the listings in the regulations. (Tr. at 16-24.) Therefore, the ALJ found that M.C. was not disabled. (Tr. at 24.)

### E. Administrative Record

7

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff's daughter, M.C., has been treated at the University Psychiatric Centers since 2005, i.e., since she was 6 years old. (Tr. at 151.) At the initial evaluation, a tentative diagnosis of ADHD was given, but a definitive diagnosis was deferred until she could be examined "by a neurologist to rule out a biological cause" for her "highly impulsive, inconsistent, emotionally labile, and somewhat disorganized behavior throughout the assessment." (Tr. at 160.)

In March 2005, Plaintiff sought "additional support" and psychological testing was performed because of "concern that [M.C.] was going to be kicked out of her school due to escalating behavior." (Tr. at 162.) The examiners found that M.C. was

> initially very quiet and responded to questions by nodding or shaking her head. Throughout testing she was often oppositional and it was unclear at times whether she was unable to complete an item or responding incorrectly to be noncompliant. She was easily distracted[,] . . . hyperactive, had difficulty remaining in her seat and was impulsive. . . . [T]he desk had to be cleared of all non-essential items. She also responded before listening to questions . . . . She would often interrupt items by asking the examiner questions about her personal life (are you married?, do you have kids?, do you sleep with your husband? . . .). When distracted, [M.C.] was not easily redirected and became increasingly noncompliant . . . [and] attention seeking. . . . At times she would respond correctly (say all her letters) and then say she did not know the correct answer of the same question at a later time. . . . [S]he became tearful when the examiner was more stern with her. . . . Affect was labile and her mood ranged from joyful, to tearful to extreme anger. She also expressed a fear and anger towards men and appeared anxious and fearful when walking past a man in the hallway on her way to use the restroom.

(Tr. at 162.) The examiner referred M.C. for therapy and for an evaluation by a psychiatrist. (Tr. at 163.)

A psychiatric evaluation performed later in March 2005 recommended that M.C. be tested "to rule out organic causes," placed on Concerta, referred for a pediatric neurology consultation and for a speech and language evaluation. (Tr. at 165.) On April 26, 2005, Dr. Mary Roberts noted that M.C.

8

> was much more talkative and interactive . . . . She was able to identify all the letters of the alphabet, was more emotionally appropriate, and displayed some disappointment when it was time to end the session. . . She continued to display anxiety, although significantly less in comparison to last session. . . . [Her] speech appeared more coherent and logical.

(Tr. at 166.) In the medication review, Dr. Roberts noted that there was a "[p]ossible mild improvement on 18 mg Concerta, despite parent's initial complaint that it did not help." (Tr. at 169.) Dr. Roberts increased the Concerta dosage at that time. (*Id.*) On May 3, 2005, M.C. "continue[d] to appear apprehensive and anxious in therapy, but was able to interact to questions with simple, straightforward answers." (Tr. at 170.)

On May 10, 2005, M.C.'s "grandmother reported that [M.C.] has significantly improved." (Tr. at 172.) Her "aggressive behaviors have decreased, she has had no reports of behavioral problems from school, and . . . she has been able to complete her homework in significantly less time (i.e., 1 hours [sic] versus all evening)." (*Id.*) Dr. Roberts noted that she "displayed more affect and appeared more comfortable. She was able to verbalize more in session, but continues to still be apprehensive and guarded." (*Id.*)

On May 24, 2005, M.C.'s grandmother reported that M.C. continued to respond well to the medications, was able to finish homework in a more timely manner and problems in school and with peers had decreased. (Tr. at 174.) The therapist noted that M.C. "continue[d] to not initiate interactions with the therapist, but is able to respond to comments or questions." (*Id.*)

On June 14, 2005, M.C.'s grandmother reported that her "behavior has improved significantly." (Tr. at 176.) Her "activity level is more contained and less irratic [sic], she does not anatagonize cousins/peers, reports from school have been primarily positive" and "aggressive behaviors have been absent for at least 2 - 3 weeks." (*Id.*) However, her "interactions with an 'imaginary friend' ha[d] not decreased." (*Id.*) The therapist stated that M.C. was "more interactive

9

and spontaneous[,] . . . initiated conversation twice, smiled several times, and appeared to enjoy playtime more . . . ." (*Id.*) She "was not, however, open to discussing her imaginary friend, but was able to recognize some positive behavioral changes since starting meds/therapy/etc." (*Id.*)

On September 15, 2005, M.C.'s mother reported that "she is doing well and that she does not get calls from school, to complain about her behavior, anymore." (Tr. at 180.) She "has not shown any behavioral problems when she is at home with her." (*Id.*) Drs. Roberts and Ahmad noted that M.C. was "stable on meds[,]" but that she had "not been for therapy sessions for months now." (*Id.*) The doctors stated they would "discuss with the mother if she wants to continue it." (*Id.*) Plaintiff's Concerta prescription was continued. (*Id.*)

On November 29, 2005, M.C.'s mother reported that M.C.'s "current school does not think that [M.C.] needs special education at this time but the school had some other programs to help her with the learning disorder . . . ." (Tr. at 183.) M.C.'s mother said she was "compliant with the current medication" and was having "[n]o thoughts of harm to herself or anyone else." (*Id.*) There were "[n]o new symptoms or complaint[s]." (*Id.*) Drs. Ahman and Roberts noted that M.C. "is doing better at home and at school with the changes in her environment" and "is stable on her medications and compliant." (*Id.*) They noted that M.C. "is not in any therapy sessions at this time and we are only seeing her for medications[, but that she] does need services for her learning disorder." (*Id.*) This same progress was noted again on December 27, 2005. (Tr. at 184.)

In January 2006, M.C.'s mother reported that her behavior had changed for the worse, that she was getting in trouble at school, doing poorly academically, her sleep was disturbed, and she was more inattentive but not hyperactive. (Tr. at 186.) Drs. Ahmad and Roberts increased the Concerta dosage to "target the inattentive symptoms," advised that a complete physical

10

examination be done to "[r]ule out any endocrine or metabolic abnormality," and that another psychological testing be done "as she was not able to complete the last one." (*Id.*)

On March 17, 2006, M.C.'s mother reported that she was "doing fine at school and home." (Tr. at 188.) Her prescription for Concerta was continued. (Tr. at 189.)

On May 12, 2006, the "results of psychological testing were discussed with the mother." (Tr. at 190.) "Mother was aware of the results and its implications [and] is willing to make changes to help [M.C.] at school and home." (*Id.*)

On July 18, 2006, M.C.'s mother reported that M.C. "has been doing ok as far as ADHD symptoms are concerned [but that] she sees a lot of anxiety in her." (Tr. at 191.) M.C.'s mother noted that she "picks her finger skin a lot" and that she "used to pick her nose skin [] and always had a scar or scab on her nose." (*Id.*) She also noted that M.C. had "been promoted to Grade 2" at school. (*Id.*) Drs. Ahmad and Roberts prescribed Zoloft for the anxiety symptoms and continued the Concerta. (Tr. at 192.)

On March 17, 2006, M.C. was referred to Angela M. Fish, M.A., TLLP, for a psychological assessment. (Tr. at 209-19.) At that time, M.C. was seven years old. (*Id.*) M.C.'s Full Scale IQ level was determined to be 60. (Tr. at 211.)

On October 9, 2006, Daniel Blake, Ph.D., completed a case analysis, i.e., a Childhood Disability Evaluation Form. (Tr. at 200-07.) Dr. Blake concluded that M.C. had the impairment of ADHD and that the impairment was severe but did not meet, medically equal, or functionally equal the Listing. (Tr. at 202.) Under the Functional Equivalence section, Dr. Blake indicated that M.C. was markedly limited in her ability to acquire and use information because she "has IQ scores in the deficient range of intellectual functioning." (Tr. at 204.) The doctor noted, however, that M.C.'s "[f]unctional abilities and even academic performance surpassed what is expected

11

given IQ scores." (*Id.*) Dr. Blake also stated that "[e]vidence in file shows significant improvement in attentional processes and task completion with medication. Also, with adequate support/structure, [M.C.] performs better . . . [and] is able to benefit from support." (*Id.*) Therefore, he found that M.C. was "less than marked[ly]" limited in the ability to attend and complete tasks. (*Id.*) Dr. Blake also found that M.C. had no limitation in the ability to move about and manipulate objects, and a less than marked limitation in her ability to care for herself because of "some difficulty with self management." (Tr. at 205-06.)

Special Education Teacher Margaret Whittick completed a report on November 10, 2006, when M.C. was eight years old. (Tr. at 220-23.) Whittick found that M.C.'s gross motor skills and fine motor skills were "appropriate for her age and grade." (Tr. at 220.) As to language skills, M.C. "has a difficult time following multi-step directions" and, as to social skills and behavior, she "struggles with age appropriate social skills in the general education and the trial resource room setting." (Tr. at 221.) It was noted that M.C. "appears to have received benefit from trial Resource Room setting where there was an aide and a teacher present with less than 8 students." (Tr. at 222.) Therefore, Ms. Whittick recommended that M.C. "be considered for special education services." (Tr. at 223.)

However, on November 12, 2006, a School Social Work Report, which was completed by Yeatonia Y. Martin, MSW, concluded that M.C. did not qualify for special education programs or services under the emotional impairment rule. (Tr. at 228-31.) Ms. Martin noted that M.C. "and her mother share a close relationship and have undergone extreme circumstances during [her] developmental years." (Tr. at 230.) "The combination of the two may have impacted [M.C.]'s life more than is thought." (*Id.*) She also stated that she was "unsure whether or not [M.C.]'s academic deficiencies are a result of her emotions or cognitive abilities." (*Id.*)

12

M.C. was also evaluated in November 2006 by Michael Spight, a school psychologist. He concluded that, "[w]hen compared to others her age, M.C. appears to be a student whose current intellectual function is within the extremely low range as demonstrated by her Full Scale IQ score range between 56 to 66 an[d] percentile rank of 0.4." (Tr. at 236.)

M.C.'s reported daily activities include attending school, doing homework, going with her mother to run errands, and visiting family members, but she is "withdrawn from any other adult outside of [her] immediate family." (Tr. at 120.) M.C.'s mother indicated that she gets along with her cousins for the first half-hour of a visit, but then "they fight most of the time." (*Id.*) She noted that the cousin also has ADHD. (*Id.*) M.C. is described as "argumentative most all the time. She shows a lot of aggression towards other children," but she "doesn't steal, set fires, [n]or is [she] cruel to animals." (*Id.*)

At the time the application was filed, M.C. was being evaluated for special education services and her mother indicated that she has "[p]eer problems, esp. with girls." (*Id.*) "[S]he does not like to share adult attention with peers." (*Id.*) M.C. does not miss school regularly and she helps with chores, i.e., making her bed, putting her clothes and toys away, and sweeping and vacuuming once weekly. (Tr. at 121.) M.C. is able to "perform these tasks correctly" with no supervision. (*Id.*) Her speech can be understood by those who know her and by those who don't know her well most of the time and she is able to answer the phone and deliver phone messages, but she is not able to repeat stories or explain why she did something. (*Id.*) M.C. is also able to make peanut butter and jelly sandwiches for herself, to pick out ingredients for her mother to cook, and to set the table correctly. (Tr. at 122.)

M.C.'s mother indicated that she "struggles with all academics[,]and she often 'shuts down' and just sits there when she does not understand a concept." (Tr. at 125.) "She will often put her

fingers in her ears or put her head down when material is too hard [and] [s]he is very slow at completing tasks, even those tasks that are within her ability level." (*Id*.) M.C.'s mother indicated that she "is currently on medication for ADHD and this medication seems to address most of her hyper-activity and a good deal of her attending problems." (Tr. at 126.) "When not medicated there are <u>very serious</u> problems seen daily and hourly." (Tr. at 126 (emphasis in original).) M.C. "gets upset when other children get more praise than she does [and] will direct her anger at other children . . . ." (Tr. at 127.)

### F. Analysis and Conclusions

#### 1. Legal Standards

After review of the record, I suggest that the ALJ utilized the proper legal standard in her application of the Commissioner's child disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

#### 2. Substantial Evidence

Plaintiff contends that substantial evidence fails to support the findings of the Commissioner. (Doc. 13.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff specifically contends that the ALJ did not properly evaluate M.C.'s impairment of intellectual functioning, *i.e*. Listing 12.05(D) (Doc. 13 at 9-11), that the ALJ failed in her duty to develop the record in assessing M.C.'s IQ (*id*. at 12), that M.C. has an impairment which equals the Listing (*id*. at 13-14), that the ALJ's credibility determination is "erroneous" (*id*. at 15), that

the ALJ failed to evaluate M.C.'s mental impairment and resulting functional limitations as required by 20 C.F.R. § 1420.1520a (*id.* at 16), and alternatively, that the case should be remanded for failure to provide a complete record. (*Id.* at 17.)

The Sixth Circuit has held that in order to meet a Listed Impairment under 12.05, a plaintiff must satisfy the diagnostic description or definition as well as the severity requirements listed in subsections (A) - (D). 20 C.F.R. § 404.1520, Subpart P, App. 1, Listing 12.05; *Foster v. Haller*, 279 F.3d 348, 354-55 (6th Cir. 2001). In the instant case, on March 17, 2006, when M.C. was seven years old, Ms. Fish assessed M.C.'s Full Scale IQ level to be 60. (Tr. at 211.) Plaintiff contends that M.C. meets Listing 12.05(C) for mental retardation, which applies when a plaintiff has a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. § 404.1520, Subpart P, App. 1, Listing 12.05(C). However, the Sixth Circuit has held that IQ scores alone are insufficient to meet 12.05(C) requirements. *Blanton v. Soc. Sec. Admin.*, 118 Fed. App'x 3, 7 (6th Cir. 2004) ("two IQ scores of 70, without more, does not satisfy the requirements of Listing 12.05(C)"). In addition, a plaintiff must satisfy the following diagnostic requirements under Listing 12.05(C): "(1) subaverage intellectual functioning; (2) onset date before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. App'x 672, 675 (6th Cir. 2009) (citing *Foster, supra*).

According to the regulations, whether the test results are current can affect whether the results give an accurate assessment of the child's IQ. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(D)(10). "IQ test results obtained between ages 7 and 16 should be considered current for . . . 2 years when the IQ is 40 or above." *Id.* Where a claimant is close to age 16, it should also be noted that "IQ test results obtained at age 16 or older should be viewed as a valid indication of the

15

child's current status, provided they are compatible with the child's current behavior." *Id.*

However, in the instant case, M.C. was only seven years old when the IQ test results were obtained on March 17, 2006, the hearing was held on February 24, 2009, and the ALJ's decision was dated May 12, 2009. Consequently, the ALJ was correct in concluding that the IQ score was not current. Plaintiff attempts to cure this problem by offering a full scale IQ score of 63, which was obtained in October 2009. (Doc. 13 at 9.) However, the ALJ cannot be at fault for failing to consider scores that were not obtained until five months after the decision was made. In addition, as noted in footnote two, district court review is limited to the evidence presented to the ALJ.

Even if evidence of a qualifying and current IQ score had been presented to the ALJ, I suggest that there is substantial evidence to support the ALJ's decision that Plaintiff has not shown that M.C. is so limited in adaptive skills as to meet the Listing. Adaptive skills are social, communicative, and daily-living skills. *Heller v. Doe*, 509 U.S. 312, 329, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993). The record evidence and the daily activities that M.C. is able to accomplish support the ALJ's decision.

Plaintiff indicated that M.C. is able to make her bed, put her clothes and toys away, sweep and vacuum once weekly, answer the phone and take messages, make peanut butter and jelly sandwiches, pick out ingredients for her mother to cook with, and set the table, all with no supervision. (Tr. at 121-22.) In addition, Dr. Blake found that M.C. "show[ed] significant improvement in attentional processes and task completion with medication," that M.C. is "less than marked[ly]" limited in the ability to attend and complete tasks, and has a less than marked limitation in her ability to care for herself because of "some difficulty with self management." (Tr. at 205-06.) Ms. Whittick recommended that M.C. be considered for special education services because she "appears to have received benefit from trial Resource Room setting where there was

16

an aide and a teacher present with less than 8 students." (Tr. at 222.) On the other hand, Ms. Martin concluded that M.C. did not qualify for special education programs or services because she was "unsure whether or not [M.C.]'s academic deficiencies are a result of her emotions or cognitive abilities." (Tr. at 230.) Finally, the record repeatedly indicates that once M.C.'s prescription medicine dosages are adjusted properly, she functions fairly well at home and school. (Tr. at 172, 174, 176, 180, 183-84, 188.) I therefore suggest that substantial evidence supports the ALJ's finding that M.C. did not meet Listing 12.05.

As to Plaintiff's argument that the ALJ's credibility determination was not supported by substantial evidence, I note that an ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters*, 127 F.3d at 531. When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645 at *3 (6th Cir. Feb. 11, 1999) (unpublished). In the instant case, the ALJ properly found Plaintiff's testimony less than fully credible where her testimony conflicted with the daily activities she reported as discussed above and the progress she reported to M.C.'s doctors. (Tr. at 180, 183.)

As to Plaintiff's contention that the ALJ failed to fully develop the record, I note that the "burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)). "Only under special circumstances, when a claimant is without counsel, not capable of presenting an effective case, and unfamiliar with hearing procedures does the ALJ have a special

duty to develop the record." *Rise v. Apfel, Comm'r of Soc. Sec.*, No. 99-6164, 2000 WL 1562846, at *2 (6th Cir. 2000) (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)). Here, no special circumstances existed because Plaintiff was represented by an attorney at the administrative hearing. Nor did claimant appear to be incapable of presenting an understandable testimony. Accordingly, I find no exceptional reason to relieve Plaintiff of her burden to prove disability and to furnish evidence to support that conclusion.

### 3.     Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.    REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                               s/ *Charles E Binder*
                                               CHARLES E. BINDER
Dated: February 23, 2011                        United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  February 23, 2011                            By    s/Patricia T. Morris
                                                                                          Law Clerk to Magistrate Judge Binder